**NORDELL et al. v. INTERNATIONAL FILTER CO.**

**CHICAGO PUMP CO. v. SAME.**

**Nos. 7323, 7324.**

Circuit Court of Appeals, Seventh Circuit.

March 21, 1941.

Franklin M. Warden, of Chicago, Ill., for appellant.

Warren C. Horton and Casper W. Ooms, both of Chicago, Ill., for appellees.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

In cause No. 7323 appellees charged appellant with infringement of the Nordell patent No. 1,948,125, of which appellee Nordell is the owner, and appellee Chicago Pump Company is the exclusive licensee. This patent was issued February 20, 1934, on an application filed April 11, 1932. In cause No. 7324 appellee charged appellant with infringement of the Durdin patent No. 1,960,303. This patent was issued May 29, 1934, on an application filed December 19, 1932. The defenses were invalidity and non-infringement. The two suits were consolidated for trial, and the court found each of the claims relied upon valid and infringed. From those decrees these appeals are prosecuted.

Both patents relate to screens for straining solids from liquids, and we shall discuss them in the order referred to.

The object of the Nordell patent is to provide a screen having continuous openings therein, whereby the openings are constantly kept clear, thereby eliminating any possibility of clogging. The disclosure consists of a screen composed of a multiplicity

of ring-like units secured together and suitably spaced apart to provide continuous openings, in combination with cleaning means entering the spaces between the units. One of the elements is rotated relative to the other, whereby the spaces between the rings are constantly kept free from the material which is being separated from the water, and which ordinarily collects in the screen openings. The screen units are secured together by means of a hub within the hollow of the screen, which is connected with one end thereof. These ring-like units have means on their exterior for breaking up solid material which is carried to the screen.

The drawings disclose an influent channel through which the unscreened water is conveyed to the screen, and an effluent channel through which the screened water is conveyed away. The latter leads from and is located below the former, and is connected thereto through an opening which is protected by the screen device upon which the patent was granted. At the end of the influent channel is a pocket wherein the trash and other solid material is deposited and from which it is removed by suitable mechanism (not shown).

Supported upon the bottom wall of the influent channel is a standard which is formed with a bearing bracket overhanging the opening into the effluent channel, which contains bearings for the screen shaft. Extending over and fitted into this opening is an annular base which is formed as a part of the standard. The screen extends upward from this annular base and rotates therein.

The bearing bracket projects down into the hollow of the screen, and is provided with a hub secured to the screen shaft directly below the lower end of the bearing bracket.

The screen is driven from any suitable source of power, and is preferably composed of a plurality of ring-like screen units spaced apart by washers and secured together by long bolts and nuts. The washers are located inwardly some distance from the peripheral edges of the screen units, so as to leave free annular spaces outwardly of the washers into which extend teeth of a comb which is bolted or otherwise secured to the standard.

The sides of the screen units are preferably parallel with each other for some distance inward from the periphery, and the teeth of the comb are fitted to the free spaces and serve to clear them from any material that might tend to lodge or collect therein. The uppermost screen unit is formed with a spider which extends down into the hollow of the screen where its arms are united to the hub.

In operation, the screen is rotated and the water passes through the spaces between the screen units into the hollow of the screen where it is discharged downwardly into the effluent channel. The water is not permitted to enter the screen through its open top, and any solid matter which is too large to pass through the spaces between the screen units discharges into the pocket from which it is removed by any suitable means (not shown). Claims 2, 3 and 4 of this patent are in issue.[1]

These claims are quite broad. Claim 2 will read upon any screen comprised of (1) any kind of a rotatable straining wall, having openings therein of a predetermined size, and (2) any kind of submerged com-

[1] 2. "A screen comprising a rotatable straining wall adapted to be interposed in a flowing stream containing solids, said wall having openings therein permitting liquid and material of small enough size to pass through said openings in the wall, a conduit in which the straining wall is interposed and through which the stream flows, the wall of said conduit serving to retain the strained out material in the stream, and submerged comminuting means carried in part by said wall for reducing the strained out material into small enough size to pass through said openings along with the flow of the liquid.

3. "A screen comprising in combination a rotating slotted cylindrical straining wall adapted to be interposed in a flow of sewage for intercepting solids of a larger size than will pass through the slots in said wall, and comminuting means, part of which is mounted on the exterior of the cylinder straining wall and the other part of which is stationarily mounted, cooperating to reduce the intercepted solids to small enough size to pass through the slots along with the flow of liquid.

4. "The method of straining sewage which consists in straining out solids from liquids in a flowing stream, and comminuting the intercepted solids below the surface of the stream without removing the intercepted solids from the stream, whereby the comminuted solids may pass through the straining means along with the flow of liquid."

minuting means, which is carried in part, and in any manner, by the straining wall. Claim 3 differs from claim 2 in that the straining wall must be cylindrical, and part of the comminuting means must be mounted on the exterior of the cylindrical straining wall, in some undesignated manner, and the other part of the comminuting means must be stationarily mounted at some undesignated place and in some undesignated manner. Claim 4 is a method of straining out solids from liquids in a flowing stream and comminuting them below the surface of the stream. It is broader than the apparatus claims.

Each of the claims provides that the comminuted particles shall pass through the openings of the straining wall along with the flow of the liquid. It is obvious that these claims are intended to cover any conceivable combination of a straining wall with comminuting means below the surface of the water, and the primary advantage of the entire disclosure is to avoid the removal, by hand or otherwise, of the obstructive materials which tend to clog the screen.

It seems to be conceded that appellees' commercial structure is quite meritorious, and it unquestionably reads upon these claims. However, it is not the same device as described in the specification of this patent. Appellees, by license or otherwise, have several patents which, so far as we are able to discern, have claims which cover every conceivable beneficial element of their commercial device, and they are not here in question.

It is obvious that this litigation is merely an effort to sustain the broadest claims of the patent, which as we have said, cover about every conceivable method for the comminution of solids in water without removing them. This conclusion is supported by the remarks of Nordell to the Examiner: "The idea of providing means to break up or comminute and intercept solids so that they will pass through the screen along with the flow of liquids appears wholly novel." Again he stated to the Examiner: "Applicant's product is the first one in the art that comminutes the solids under the surface of the sewage and permits the reduced pieces to pass through the screen along with the flow. This being so, a combination of old elements which produces a new result is evidence of invention. Numerous material changes had to be made in combining the old devices, and these changes were not apparent from the references, but now in the light of applicant's disclosure they may seem easy."

We think it is clear from this record that Nordell was not the first to comminute solids under the surface of the sewage, thus permitting the reduced pieces to pass through the screen along with the flow of the water. There was considerable prior art not cited by the Examiner, which we think is quite pertinent. Among this prior art were certain German publications which clearly described the comminution of solids in liquids without removing the solids from the stream. Appellees raise the technical objection that in the translation of these publications the translator erred in translating each of the two German words to mean comminution. The authorities cited do not support appellees' contention in this respect. United States patents No. 108,664 to Wigner, and No. 1,449,622 to Peck, clearly disclose the comminution of solids under the surface of the water. This accomplishment was precisely what Nordell told the Examiner was new in the art, and there can be no presumption of validity over this prior art which the Examiner did not note. We are here confronted with a strange doctrine, that the fact that the Examiner did not mention this art raised no presumption that he did not see it and consider it. But on the other hand, appellees urge that it raises a presumption that the Examiner was aware of it and did not consider it applicable. We do not understand this to be the law.

Appellees urge that the Wigner patent relates only to those processes in which chemicals, or other matters, are mixed with sewage in order to purify it. This is true, but it also discloses means which tear up and thoroughly macerate any coarse solid matter contained in the sewage, and this he does under the surface of the water, the very thing which Nordell told the Examiner was the new feature of the patent. Appellees, however, insist that the word "macerate" does not mean comminute, but they overlook the words "tear up" which Wigner also uses. These words clearly convey the idea of reducing to minute particles, or even crushing or pulverizing, which are the precise definitions given for the word "comminute."

It is further urged by appellees that Wigner's disclosure would not comminute such articles as nails, pitchforks, and 2 x 4 pieces of lumber, as they say Nordell's de-

vice would. This is quite true, and it may also be admitted that Nordell used no chemicals and that in all respects his device is far superior to that of Wigner. However, we are not dealing here with how well either device accomplishes the work desired. The fact remains that Wigner, if later, would at least infringe claims 2 and 4, with respect to the comminution of solids under water, and this would be true regardless of the fact that Wigner used chemicals to accomplish another result. The measure of these claims is not to be based entirely upon the size or the character of the solids, nor as to how well the act of comminution is performed. This is not to criticize the utility or the patentability of appellee's commercial device. We merely hold that claims 2 and 4 of this patent are at least broader than necessary to protect the Nordell device, and they are entirely too broad because they read upon the prior art.

It is not necessary to pass upon the validity of claim 3, for we think it is obvious that appellant's device does not infringe it. Defendant's device is not a cylindrical straining wall adapted to be interposed in a flow of sewage. It is composed of alternating, convex, stationary bars and rotating discs, and has the flow characteristics of a bar type screen. The only respect in which it is similar to appellees' cylindrical rotating screen lies in the fact that appellant's alternating discs rotate. However, its alternating convex stationary bars do not rotate, and they do not form a cylinder. They are convex, and of themselves constitute a bar screen. Of course, its meshes are reduced in size as the peripheries of the discs pass through the spaces between the bars, but we think it can not be said that the bars and the discs together constitute a rotating cylindrical straining wall, as in Nordell. In Nordell's device the particles are cut against a side mounted comb and released on the upstream side of the cylindrical screen. Further, these particles join the flow of sewage from the upstream side of the screen and comply with the requirements of claim 2 that they "pass through said openings along with the flow of the liquid." These openings in Nordell are the openings in the rotating straining wall, and his entire straining wall is completely surrounded by sewage which has not yet passed through the straining wall.

In appellant's device the flow of liquid is directly through the screen from one side only. The cutters on the revolving discs cut pieces from the large solids against a slotted cutter bar which constitutes the partition in the stream between the upstream side and the downstream side. The particles which are comminuted from the large solids do not remain on the upstream side of the screen, but are punched through the cutter bar to the downstream side by the action of the cutting teeth. In other words, the cut particles do not pass through the openings in the rotatable screening wall, but they are transferred to the downstream side by the rotating teeth rather than by the flow of liquid through the screen. In this respect we think that defendant's device has the flow characteristics of a bar type screen, for the cutoff particles never pass through the slots in any rotating wall, because its cutter bar through which the comminuted particles are punched is mounted on an independent stationary partition which blocks off the flow of sewage through the channel.

We are further convinced that the elements employed by appellant cannot be considered as equivalents of those used by appellee. True, the final result of comminution is the same, but we are convinced that neither the means nor the manner in which they are used are the same as those of appellees' structure. For these reasons we hold that claims 2 and 4 are invalid, and that claim 3 is not infringed.

■■ The Durdin patent also relates to screens, and has particular reference to those adapted for screen sewage. The principal object is to provide a stationary self-cleaning wall of cylindrical form, having circumferentially disposed slots therein through which the strained or screened liquid may flow to another place for subsequent treatment. Other objects are to provide rotating cleaning means for the slots, and other novel means for clearing the slot-cleaning means. Claims 5 and 6 are relied upon,[2] and they are not materially different.

---

[2] 5. "A screen comprising in combination a stationary circumferentially slotted straining wall of cylindrical form, said wall having abutments disposed outside the curved plane of the wall, and a rotating toothed scraper having rigid teeth traversing the slots and projecting beyond said curved wall and co-operating with said abutments of the wall to comminute material caught between the teeth and abutments.

6. "A screen comprising in combina-

Claim 5 calls for abutments disposed outside the curved plane of the wall. While the word "abutments" is not used in the specification, yet the elements which obviously support the term are four supports which are directly secured· to and connect together the ring segments, and when so connected the segments form complete rings. The nearest elements in appellant's device to Durdin's "abutments" are the terminal supporting flanges for the stationary screening bars. In appellant's device, however, the terminal supporting flanges for ends of the screen bars do not "connect the ends of the ring sections, thereby formin complete rings." Appellant's device is neither cylindrical, nor does it have complete rings.

Claim 5 also calls for a rotating toothed scraper having rigid teeth traversing the slots and projecting beyond the curved wall. The portion of Durdin's structure which complies with this limitation consists of rotatable upright bars provided with rotatable holes into which are fitted the teeth or scraper blades. With respect to this element, he stated: "In operation the shaft is rotated and therewith the heads are rotated with the teeth traversing the slots and clearing them of any solid or semi-solid matter which may have collected therein." The only rotating parts of appellant's structure are the alternating discs. The edges of these discs form one side of the screening slots, and in no sense can they be considered as toothed scrapers having rigid teeth traversing the slots. The slots formed by appellant's discs are of constant width and nothing traverses them or scrapes them out. The cutting teeth used by appellant are positioned outside of the slots formed by the rotating discs and stationary bars. These teeth do not and cannot traverse the slots.

Claim 5 also limits his rotating toothed scraper to co-operation with the abutments of the wall to comminute the material caught between the teeth and abutments. Here the scraper teeth are set to comminute material against the inner edge of the four ring supports. To support his ring sections and to join them in cylindrical form he uses four, or a plurality of, abutments or supports. Hence, they have a dual function for they support the rings in cylindrical form, and they constitute a part of the comminuting construction. As with Nordell, the sewage passes through the cylindrical screen from all sides, and solids are intercepted around the entire periphery, and comminution occurs at each of the four abutments, thus serving all sides of the screen at the same time.

In appellant's machine the entire cutting is against a removable cutter bar, which is mounted on a single separate partition, which blocks off the sewage channel to the side of the machine. It varies in width in accordance with the width of the sewage channel, so that the machine will fit a channel of any width.

Appellant's screen bars are made of an integral casting, having side flanges, and are rigidly bolted to a plate in the floor of the sewage channel. Hence, there is no cutting action against any supports or abutments of the screening wall. Durdin has no partition to which the cutter bar is attached. Indeed, he needs no partition wall, since he has a cylindrical screen having a bottom discharge. Furthermore his limitation requires a plurality of abutments, while in appellant's device there is a single cutting unit.

Claim 6 is substantially the same as claim 5, except that in the former he refers to the abutments as supports. We are convinced that appellant does not use the same elements as disclosed by Durdin, nor does it use his elements in the same manner as Durdin in order to produce the comminution. What we have said with respect to the Nordell patent and the uncited prior art is likewise applicable here, and from what ·we have said before with respect to all of the claims relied upon in both patents, we are unable to conclude that Nordell was a pioneer with respect to any of the disclosures of these claims, and we think they should be construed narrowly. We feel more certain of this conclusion by reason of the fact that not one of the devices under the Nordell patent here in suit was ever sold, nor was any device under the Durdin patent ever manufactured.

It must be understood, however, that what we have said must not be considered

tion a stationary circumferentially slotted straining wall of cylindrical form, having supports at one side of the slotted portion of the wall, and a rotating toothed scraper having rigid teeth and traversing the slots and projecting beyond the wall, said teeth co-operating with the supports to comminute material caught between the teeth and the supports."

applicable to the many other claims of these two patents, or to the many claims of the other Nordell patents which appellees own or control. We have no occasion to question the validity of any of those claims and we disclaim any intention here of limiting the patentable protection of the elements disclosed in appellee's commercial device. We merely hold that claims 2 and 4 of the Nordell patent are invalid and that neither claim 3 of the Nordell patent nor claims 5 and 6 of the Durdin patent are infringed by appellant's device.

The decree is reversed and the cause is remanded for further proceedings in accordance with this opinion.