**NOBLE COMPANY, a corporation, Plaintiff,**

**v.**

**The C. S. JOHNSON COMPANY, a corporation, Defendant.**

**Civ. A. No. 2002.**

United States District Court
E. D. Illinois.

Feb. 28, 1956.

son", to obtain a declaratory judgment pursuant to Section 2201, Title 28 U.S. C.A. Noble alleged that a controversy had arisen on the validity and infringement of Johnson patents No. 2,199,289 hereinafter referred to as 2199, and No. 2,109,534 hereinafter referred to as 2109. Johnson filed a counterclaim alleging the ownership of the patents by virtue of an assignment from C. S. Johnson, the inventor, and the infringement of both patents by Noble. Noble answered the counterclaim admitting the ownership of the patents but alleging their invalidity and denying the infringement. The trial proceeded upon the counterclaim by stipulation.

In Johnson patent No. 2199, application was filed February 6, 1935 and issued April 30, 1940. It is termed a "Central Mixing Plant" or a "Vertical Flow Plant". There are storage bins for sand, cement and gravel located at the top of the plant. The materials are lifted or dumped into various bins. Under each bin is a weighing device called a batcher. The materials from the bins are permitted to flow into the batchers by opening and closing of a gate. Below the batchers is a hopper to collect the various materials making up the mix or aggregate. A suitable chute is provided below the hopper to convey the aggregate into one or more of the mixers which are arranged below the hopper. The mixers have a single end opening, charging and discharging at the center axis of the plant. A receiver is provided below the mixers to receive the mixed concrete from the various mixers. The flow of gravity operates the plant.

A. Donham Owen, San Francisco, Cal., Edmund C. Rogers, St. Louis, Mo., for plaintiff.

Carlson, Pitzner, Hubbard & Wolfe, Chicago, Ill., for defendant.

PLATT, District Judge.

The plaintiff, Noble Co., a California Corporation, hereinafter referred to as "Noble", filed this action against the C. S. Johnson Company, an Illinois Corporation, hereinafter referred to as "John-

In patent No. 2199 it was stipulated that Johnson would stand on claim No. 2 which reads as follows:

"In a central mixing plant, a plurality of mixers having charging openings, said mixers being disposed with their charging openings directed towards a common center, and said mixers being further adapted to discharge towards the aforesaid common center, an aggregate collecting hopper supported at

an elevation above said mixers, a movable distributing chute leading from said aggregate collecting hopper and adjustable about a vertical axis passing substantially through the common center aforesaid to direct aggregates from the hopper to any selected one of the mixers, and a mixed concrete receiver common to all of the mixers and disposed below the mixers, the said receiver being open at its upper end and extending laterally about a vertical axis passing through the aforesaid common center so as to be capable of selectively receiving mixed concrete from the mixers."

This claim, specification and evidence disclose that the elements upon which No. 2199 is to stand for invention and validity as a patent are:

1. A plurality of single ended mixers with their charge-discharge openings all pointed toward the center of the plant.

2. An aggregate collecting hopper above the mixers.

3. A distributing chute below the aggregate hopper movable to feed the aggregate into any one of the mixers.

4. A receiver below the mixers, of a shape to receive concrete from all the mixers.

▆▆▆ The prior art in evidence discloses that each of these elements was old. None of the prior art hereinafter referred to was cited in the patent office. Tilting mixers which were charged and discharged from one end are disclosed in the Brown patent, No. 1,314,124, August 26, 1919, Piispanen patent, No. 1,780,-940, November 11, 1930, A. G. Reed patent, No. 1,848,223, March 8, 1932. Johnson insists that single end mixers were not commonly available at the time of his invention. This does not destroy the conclusion that they were old in the art. The movable distributing chute is found in W. Watson patent, No. 282,425, July 31, 1883. This invention relates to an improvement in grain elevators.

This is analogous art and was so considered in Concrete Appliances Co. v. Gomery, 269 U.S. 177, 181, 46 S.Ct. 42, 70 L.Ed. 222. In the Herbert plant built by Johnson in 1931 and the Madden Dam plant which was sold and planned by Johnson in 1932 we find a movable distributing chute. Madden appeared in a publication of "Engineering News Record" December 8, 1932. Such a chute was also used in Bolz patent, No. 997,742 dated July 11, 1911, where the materials were moved to one side or the other by a flopgate. Aggregate collecting hoppers from which the aggregates flow into the distributing chute were used in the Herbert plant in 1931 and the Madden Dam plant. The mixed concrete receiver is described in the patent at p. 3, col. 2 as being a "hopper, car-body, or any desired type of receptacle or holder means, * * broadly characterized as a receiver for mixed concrete." Such a concrete receiver to receive from all the mixers was used in Madden Dam plant and Waterlip plant as shown in "Pit & Quarry" publication of March 26, 1930. Although Figure 2 in patent 2199 indicates four mixers claim 2 neither limits the size nor the number of mixers.

The prior art anticipates this patent. The "vertical flow plant" such as appears in 2199 is shown on "Stephens-Adamson" plant in the publication in catalogue of 1931. The drawing shows the overhead bins for different materials which were filled by a conveyor. "The materials are withdrawn from the bins by feeders and discharged into the weigh hoppers." It shows the bins, batchers, receiving hoppers, and the chute below the hopper to convey the aggregates into the mixer. The Waterlip plant utilized the distributing chute in the form of a flopgate under an aggregate hopper which permitted the aggregates to be placed in one or the other of two mixers which charged and discharged from one end and tilted to be discharged into a common receiving hopper. All the elements functioning as in Johnson 2199.

Johnson maintains that with the vertical center axis plant the height of the

bins is lowered and there is less expense in elevating materials to the bins. This was accomplished in the Herbert plant and it is quite obvious that it was present in the Waterlip and Stephens-Adamson plants.

Johnson further contends that by the use of a short chute charging a mixer facing the center axis of the plant premixing was obtained and it required less time for the aggregates to remain in the mixers after water was added. This was also achieved in the Herbert plant and accomplished in the Waterlip plant. Madden was a center axis plant and if single end charge and discharge mixers are substituted it requires only the mechanical change of a direct chute from the aggregate collecting hopper instead of chutes with elbows to charge the mixers.

█ In view of the prior art this court cannot see that there is an invention in 2199. It is the general rule that all the elements of a combination claim need not be found in a single prior art. Richmond Screw Anchor Co. v. Umbach, 7 Cir., 173 F.2d 521, certiorari denied 337 U.S. 919, 69 S.Ct. 1161, 93 L.Ed. 1728. It must be concluded after an examination of these old elements that patent 2199 is invalid because the functions of the four old elements are the same as in the prior art and no new results are obtained by their association.

"'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.'" Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 151, 71 S.Ct. 127, 130, 95 L.Ed. 162.

This brings forward the Johnson patent No. 2109, where the application was filed June 27, 1935 and patent issued March 1, 1938. Here again we have a "central mixing plant" which "deals primarily with problems arising in the construction of such plants when designed for the mixing of huge quantities of concrete such as may be employed in the building of large dams and similar artificial masonry projects." It provides "means under proper control which enables the operator at the control station to select the particular batchers (weigh batching units) for the various aggregates, which batchers are to be utilized in the combining of predetermined selected aggregates that are to make up the batch to be finally mixed in the mixer." Line 21, Col. 2; page 1 of the patent.

In this patent Johnson relies upon claim No. 31 which reads as follows:

"In a materials proportioning plant, in combination, supply means for different aggregates, proportioning devices for receiving each one of said aggregates from the supply means, a plurality of measuring instrumentalities for each proportioning device, and a common control for said measuring instrumentalities for rendering one of said measuring instrumentalities for each proportioning device operative for measuring a predetermined quantity of materials handled by each proportioning device."

Johnson in his specifications shows that he utilized beam scales for each batcher instead of dial scales which according to the evidence were interchangeable in the art, with four separate weigh beams under each tare beam for sand, cement and gravel. The scales were hung like a ladder below the tare beam, and the ingredients could be weighed on each beam. The ingredient beams are held off the ladder and hence, free from the main beam, by small hydraulic ram plungers. If any plunger is withdrawn, its beam is lowered onto the ladder. Johnson connected all of the number one beam rams together, all of the number 2 beam rams together, and all of the number 3 beam rams together. These several connections were then brought down to a single hydraulic valve that controlled the inlet of hydraulic pressure. The valve could be moved to place in

use the number one beam rams, the number 2 beam rams, or the number 3 beam rams by being moved to one of the three positions at the control stand as shown in Figure 7, Sheet 5 of the patent. The poises on the various ingredient beams could be pre-set so that one operator could select the desired mix.

We find four elements in a materials proportioning plant, in combination, which is not limited to the size of the plant:

1. Supply bins;

2. Individual batchers, one for each bin;

3. A multiple beam scale for each batcher; and

4. A common control for placing a selected beam of each multibeam scale into operation.

The first three elements were old in the art. The supply means for different aggregates is found in the Hoover Dam plant, Herbert plant 1931, J. F. Robb, No. 1,750,244, March 11, 1930, and R. E. Robb, No. 2,044,017, application filed June 28, 1929, and patent issued June 16, 1936.[1] The individual batchers are also shown in J. F. Robb and R. E. Robb. Multiple beam scales are found in the Davis patent, No. 37,569, February 3, 1863. J. F. Robb had individual weighing and mix selection or regulation through variability of beam scale counterweights. Gagnon patent, No. 854,285, May 21, 1907, also used multiple beam scales. The Hoover Dam plant had individual or simultaneous weighing with mix selection on beam scales by manual adjustment of the poises. The Madden Dam plant had individual weighing with mix selection on dial scales by multiple adjustable indexes or pointers on each scale rim. General Electric as shown in publication of "Rock Products" dated September 26, 1931, and Stephens-Adamson in 1931, had scale rim indexes with lights plus photoelectric devices to make the weighing automatic.

Johnson contends that the novelty and invention in No. 2109 is found in the common control and simultaneous weighing or batching instead of sequential weighing. Venable patent, No. 1,982,-127, application filed November 27, 1931, issued November 27, 1934, taught simultaneous weighing as well as sequential weighing as being interchangeable, but suggested it was more economical "especially where plurality of kinds of material have to be included in each batch" to use the simultaneous method.[2] The Hoover Dam also utilized simultaneous weighing. Madsen patent, No. 2,038,-746, application filed August 24, 1931, issued April 28, 1936 had bins, batchers on weighing devices, multiple pre-set scales, and a common control. The batch selector control handle permitted the operator to select different quantities of the various ingredients to form the type of mix to be used. Madsen used the dial scales with pre-set contacts on the dial which were connected electrically to cause the opening and closing of the bin gate. However, Madsen taught the use of sequential and not simultaneous weighing. By connecting the various rings, one for each ingredient, the Madsen patent would be the equivalent to a four scale plant as in 2109, and thus simultaneous weighing with common control. This would require only mechanical skill. In H. A. Essman patent, No. 1,624,588, April 12, 1927, there is a control wheel which would operate different levers and place one of four different weights on a beam scale. In this manner 15 batches of various ingredients could be made at one time. N. Newman patent, No. 741,975, October 20, 1903, portrayed automatic electric weighing devices. However, it was designed to weigh staples such as coffee, sugar, peas, beans, etc. It had automatic

1. The application antedating the application in the instant case by more than two years is prior art, although the patent issued after the application on the instant patent. In re Walker, 99 F.2d 976, 26 C.C.P.A., Patents, 739; Title 35 U.S.C.A. § 31 prior to amendment in 1939, effective 1940, now 35 U.S.C.A. §§ 101, 102.

2. Venable patent p. 1, col. 1, line 41 et seq.

shut-off on the gates although it did not open and close the gates to weigh accurately. At Hoover Dam there was automatic weighing of the ingredients in separate batchers which dropped the material onto a belt where it was conveyed to a collecting hopper, which permitted chuting into the mixers. Hoover had simultaneous batching from a central control point, but utilized a single beam for weighing each material. If the Davis patent which utilized several scales was combined with Hoover we would have a multibeam scale as we have in 2109. One skilled in the art would make only a mechanical change to adopt the multibeam scales into the Hoover mechanism.

 Norris Dam anticipated the broad claim in 2109. "By means of the control board, five different concrete mixes could be produced without resetting the weigh-batcher scale indicators. Five sets of pointer lights on weigh-batcher scale dials operated from the control board made rapid mix selections possible." It had supply means, proportioning devices, plurality for measuring instrumèntalites and a common control as described. Since dial scales and beam scales were used interchangeably in the art Norris Dam anticipated 2109. Johnson maintains that the Norris plant not being known more than two years prior to the application date, June 27, 1935,[3] could not be prior art nor anticipate patent 2109. In this contention Johnson overlooks the fact that section 31, Title 35 U.S.C.A. reads in part as follows:

"Any person who has invented or discovered any new and useful art * * * or any new and useful improvements thereof * * * *not known* or used *by others in this country, before his invention or discovery thereof* * * *." (Emphasis supplied.)

This is explained in Moore v. Baltimore & O. R. Co., 4 Cir., 37 F.2d 884, 888 wherein it was stated:

"Complainant objects that some of the evidence as to prior use relates to use within two years of his application; but this is entirely immaterial. It is true that, under section 4886 of the Revised Statutes (35 U.S.C.A. § 31), public use of the subject matter of an invention for not more than two years prior to an application will not bar the inventor's right to a patent; but this applies where the applicant is the inventor. Where the device used was not invented by the applicant, but devised by others, it constitutes an anticipation irrespective of the period by which it antedates his supposed invention. To be patentable, the device must be new; and it is not new if others have already made use of it. Walker on Patents (6th Ed.) §§ 110 and 111."

To the same effect is Curtis Companies, Inc., v. Masters Metal Strip Service, 7 Cir., 125 F.2d 690. Evidently Johnson seeks to avoid this law by the statement that the Norris plant was developed by C. S. Johnson himself. To substantiate this Johnson points to the testimony on direct examination of his witness Mr. Ackerman.

"Q. And over how long a period of time did you continue to have contact with *Mr. Johnson* professionally?

"A. The contacts continued first of all in a business way through the fact that we awarded *him* the contract for supplying the batching equipment for Madden Dam. I had occasion to visit his plant in 1932 to check on the progress of fabrication of that equipment. I had later opportunity to visit with him after I was residing in Panama, during a period of a trip to the United States

---

3. Johnson did not attempt to carry back the date of invention prior to the application. The burden to do so is on the patentee. Torrey v. Hancock, 8 Cir., 184 F. 61; Moline Plow Co. v. Rock Island Plow Co., 7 Cir., 212 F. 727.

and when I was engaged by the Tennessee Valley Authority to take charge of the design of a similar type of construction plant for Norris Dam. *He* again appeared very actively in the offering of *his* equipment for that project. The equipment furnished by the C. S. Johnson Company for Norris Dam also consisted of the *batching equipment*. The structural steel was purchased by the Tennessee Valley Authority directly from a steel fabricator, but the general layout and arrangement of the mixing plant structure was a duplicate of the Madden Dam plant, and therefore contained some of the ideas which *Mr. Johnson had given us concerning that type of plant*. I had occasional contacts with *him* thereafter until the time of his death." (Emphasis supplied by Johnson's counsel.)

This does not lead to the conclusion that C. S. Johnson, who was president of Johnson, developed the Norris plant. When Ackerman said "that we awarded him the contract for supplying the batching equipment for Madden Dam," he undoubtedly meant the C. S. Johnson Company whom C. S. Johnson represented. He further stated that "the equipment furnished by the C. S. Johnson Company for Norris Dam also consisted of batching equipment * * * the general layout and arrangement of the mixing plant structure was a duplicate of the Madden Dam plant, and therefore contained some of the ideas which Mr. Johnson had given us concerning that type of plant." There is not expressed by even a reasonable inference that C. S. Johnson developed the Norris plant. It was the Madden plant to which Ackerman refers as C. S. Johnson's ideas. It confirms the conclusion that the Madden plant was similar to Norris, and it too was an anticipation of 2109. The Norris plant was planned and sold by Johnson long before the filing of the application in 2109 and would invalidate 2109.

"A mere experimental use is not the public use defined by the Act, *but a single use for profit,* not purposely hidden, is such." Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 20, 59 S.Ct. 675, 684, 83 L.Ed. 1071. (Emphasis supplied.) Johnson's counsel also relies on the affidavit of C. S. Johnson in the file wrapper "that he does not know and does not believe that the same was ever known or used before his invention or discovery thereof." This is a mere conclusion, states no facts and proves nothing. Norris plant must have been known to the persons at the Johnson plant for at least one year prior to its use at Norris Dam. The burden was not upon Noble who was attacking the patent to prove who had developed Norris, but this was required of Johnson. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. Since the Norris equipment was developed by the Johnson Company rather than by C. S. Johnson personally it would constitute an anticipation since it was known to others before the time of the filing of the application of 2109. Orrison v. C. Hoffberger Co., 4 Cir., 190 F.2d 787, 789.

Neither patent 2199 nor 2109 is valid. There is the presumption of validity but where the prior art was not cited or used as a reference in the patent office the presumption of validity is dissipated. Boynton v. Chicago Hardware Foundry Co., 7 Cir., 77 F.2d 799; Nordell v. International Filter Co., 7 Cir., 119 F.2d 948. None of the prior art used by this court was present before the Examiner in 2199. In 2109, Robb 1,750,244, Newman and Essman were before the patent examiner, but neither the patents of R. E. Robb, Venable and Madsen, nor Hoover, Herbert, Madden, and Norris plants were taken into consideration. The improvements, if any, in Johnson's patents over the prior art were not beyond mechanical skill and do not reach the status of invention. General Time Corp. v. Hansen Mfg. Co., 7 Cir., 199 F.2d 259; Associated Plas-

tics Cos. v. Gits Molding Corp., 7 Cir., 182 F.2d 1000; McCord Corp. v. Beacon Auto Radiator Co., 1 Cir., 193 F.2d 985.

■ Johnson places great weight upon the commercial success of the patents. It is only where the question of invention is doubtful that commercial success may be considered in aid of the validity of a patent. Here there is no question but that the patents were not entitled to be elevated to invention. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005.

It is not necessary to discuss the question of infringement for the reason that the patents involved are invalid. The counterclaim must be dismissed. Noble may submit findings of fact, conclusions of law, and appropriate order.