**Gustave W. BORKLAND**

v.

**Svend PEDERSEN and Borghild Pedersen, co-partners, doing business as Paramount Plastics Co.**

**No. 51 C 691.**

United States District Court
N. D. Illinois.
May 31, 1956.

Edward A. Haight, Robert R. Lockwood, John W. Hofeldt, Chicago, Ill., for plaintiff.

Casper W. Ooms, Robert C. Williams, David L. Ladd, Chicago, Ill., for defendants.

HOFFMAN, District Judge.

The validity of Patents Nos. 2,357,806 and Re. 23,171, both relating to the forming of plastic material, is the chief issue in this case. The plaintiff, as the alleged inventor and owner of the patents, seeks to enjoin, and recover damages for infringement. By answer and counterclaim the defendants ask that this court declare these patents to be invalid for lack of invention and because anticipated by prior use, publications and patents. The denial of infringement contained in the answer was, during the trial, in effect reduced to the contention that, even if the patents were valid, the defendants in certain instances perform their operations in a manner so materially different from the processes and apparatus covered by the patents as not to constitute an infringement and hence any adverse judgment should except the non-infringing processes.

The plaintiff, Gustave W. Borkland, is an individual engaged in the development of processes, products, methods and equipment for the plastics industry. He maintains laboratories in Marion, Indiana.

The defendants, Svend Pedersen and his wife, Borghild Pedersen, are partners doing business in Chicago, Illinois, under the firm name of Paramount Plastics Co. The husband, Svend Pedersen, was by trade a cabinet maker. From 1942 until 1945 he was employed by the General Plastics Corporation to make wooden forms or dies for use in shaping plastic articles. Throughout this period the plaintiff Borkland was president of that corporation. The defendant Svend Pedersen knew nothing about the processing or forming of plastic materials at the time he went to work for General Plastics Corporation. Upon leaving General Plastics Corporation the defendant Svend Pedersen and his wife established their own business of fabricating plastic sheets, in which they admittedly use methods and processes learned from the plaintiff Borkland. The plaintiff has at all times been, and still is, willing to license the defendants to use his patents in return for a very small royalty—one to three per cent of sales price or one cent per pound of plastic used. But the defendants have refused to recognize the validity of the patents. In some of their operations the defendants have added an additional step which they consider an improvement over Borkland's alleged inventions.

The processes and apparatus in litigation may be used in the production of any hollow article made from a plastic sheet material. The exhibits in this case, introduced to illustrate the varied applications of the patent claims, include lamp shades, blister packs used for packaging automobile parts, model of a candle sixty inches tall and six inches in diameter, Gulf Oil Company advertisement containing in bas relief life size face, ears, and front half of cap of Gulf Oil station attendant, ice cube tray, pic-

ture frame, blouse form and projector case.

The processes covered by the Borkland patents are admittedly widely used in the commercial production of plastic products. The defendants' counsel estimated that there were at least fifty companies currently using these processes and the plaintiff Borkland estimated that there were nearly two hundred. Approximately $86,000 was received by plaintiff in royalties from licenses issued under these two patents for the fourteen year period from 1941 to 1955, according to the plaintiff's testimony, though he offered no supporting proof. The only substantial license, that to B. F. Goodrich Co., has been cancelled. Two other licenses are now in litigation. Only three licenses were outstanding as of January 1956, on which the plaintiff is still receiving royalties. All of these covered patents in addition to the two here involved. The total income from royalties which plaintiff received in 1955 did not exceed $1,100.

The plaintiff explains the failure of the industry to accord recognition to his patents as due to a concerted plan, fostered by a large manufacturer of sheet plastic material, to infringe. The defendants, on the other hand, explain this non-recognition as due to the industry's knowledge that all the techniques claimed by Borkland as inventions had long

been part of the art and hence could be freely adopted and used without paying tribute to Borkland.

The first patent in point of time of issue, which allegedly is infringed by the defendants, is Patent No. 2,357,806, dated September 12, 1944, for a "Method of Making Cupped Formations of Thermoplastic Sheet Material." The patent contains only one claim—a claim for a process which consists of three simple steps. The relative order of the first two steps is immaterial but both of them must precede the third. In the following statement the order which appears in the claim is set forth, although in the specifications preceding the claim the step here designated as step two precedes step one. The three steps are as follows:

First step, heating a sheet of thin plastic material.[1]

Second step, fastening the sheet securely at the edges so it cannot slip.[2]

Third step, applying an unheated pressure-exerting means to the heated sheet in such a manner as to stretch and draw the sheet into cupped formations without the pressure-receiving portions of the sheet being in contact with the pressure-exerting means during a substantial part of the drawing and stretching.[3]

Step three actually involves no more than the use of the customary male die, either alone or in conjunction with a

---

1. There is no contention that any invention inhered in the extent of the heating which is described in the claim as "heating the sheet to render it sufficiently ductile to enable it to be stretched materially but not sufficiently to render it deformable by gravity" (page 2, col. 2, lines 8–11).

2. This is described in the claim as "securing a marginal portion of the sheet surrounding the portion to be cupped against lateral slipping" (page 2, col. 2, lines 11–13). The description of the process set out in the specification preceding the claim reads: "a thin flat sheet is clamped firmly between the clamping sections 11 and 12 of a rectangular frame 13 and heated" (page 1, col. 2, lines 18–20).

3. This is described in the claim as "applying unheated pressure-exerting means on a sheet transverse to the plane of the sheet on central portions of the sheet spaced laterally inwardly a substantial distance from said marginal portions to depress said central portions to form the bottom of the cupped formation and to stretch and draw the heated ductile sheet material lying between the marginally-secured portions and the pressure-receiving portions of the sheet to form the outwardly-flaring side portions of the cupped formation, the heating operation being prior to the drawing operation, the portions of the sheet lying between the marginally-secured portions and the pressure-receiving portions being out of contact with the pressure-exerting means during a substantial part of the said drawing and stretching operation" (page 2, col. 2, lines 13–30).

female die, to form ductile sheet material. In the drawings and specifications appearing in the patent the pressure-exerting means disclosed are the usual male die with an accompanying skeleton female die.[4] The specifications state that sponge rubber may be used in lieu of a female die to press the sheet material into the configuration of the male die and in the accompanying drawings two of the figures illustrate such a use of sponge rubber.[5]

Any ordinary male die except one so shaped that it has an absolutely flat bottom and absolutely perpendicular walls at right angles with the bottom, whether used alone or in conjunction with a matching female die, must necessarily draw and stretch a ductile sheet without the portions of the sheet which are being drawn and stretched touching the die during a substantial part of the drawing and stretching operations. This is evident upon analysis of the reaction of a ductile sheet to the application of a male die. The portions of the sheet lying between its firmly secured edges and the first point of the die to touch the sheet will draw and stretch as the die presses against the sheet. From the time the first point of the die touches the sheet until the die reaches its furthest point of pressure, the stretching and drawing continues. Even when the die reaches its ultimate pressure point it may be necessary to use some pressure other than the mechanical force of the male die itself to cause the sheet to conform fully to the male die. In either event, only when the sheet conforms to the die at all points will the drawing and stretching be completed. Until that time a large part, if not all, of the stretching and drawing will have been of portions of the sheet not touching any pressure-exerting means.

The concept that the pressure-receiving portions of the ductile sheet shall be out of contact with the pressure-exerting means "during at least a substantial part of said drawing and stretching operation" (page 2, col. 2, lines 27–30), as it appears in Borkland's first patent, does not involve any element of special timing. Except for the statement in the disclosure of his process that the male die is "brought down gradually onto the sheet" (page 1, col. 2, lines 24–25), there is no other reference to timing in either the specifications or the claim. The apparatus disclosed contains no device to control timing. The unimportance of the timing appears fully from Borkland's contentions in this case that his

---

4. "The forming die 18 [male] is then brought down gradually onto the sheet, stretching the heated plastic sheet over and between sections 15, 16 and 17 of the die 14 [female]. It will be noted that between the points *a* and *b*, the points *c* and *d*, and the points *e* and *f*, there is no part of the die 14 [female] for cooperation with the internal forming die 18 [male]. It is only where there is to be a re-entrant portion of the contour of the shield that a section of the die 14 [female] is required. This skeleton formation of the die 14 [female] enables the plastic sheet to slip with considerable freedom on the surface of the die 18 [male] as this die descends. It thus enables a substantially uniform stretching of the sheet of heated plastic material, resulting in a substantially uniform thickness of the stretched sheet. The formed sheet cools and sets quickly after being formed, due to its contact with the forming dies." (Page 1, col. 2, lines 23–42.)

5. Thus the specifications state: "If desired, the sections 17 may be of some material such as sponge rubber which will yield when the die 18 is brought down, causing portions of the sponge rubber sections 17 to enter into the corrugations on die 18 [male] to press the warm plastic sheet material into the forming corrugations" (page 1, col. 2, lines 43–49). And again, "In Figs. 5 and 6, however, a comparatively thin sheet 19 of elastic yieldable material such as sponge rubber is stretched across the opening in the frame through which the forming die 18 [male] enters. A suitable backing or support 20 for this rubber sheet is provided so that when the die 18 [male] is in its lowermost position, as shown in Fig. 6, this backing will support the sponge rubber sheet and cause portions of the sponge rubber to firmly engage the thermoplastic sheet and force it snugly against the forming portions of the die" (page 1, col. 2, line 55, to page 2, col. 1, line 11).

process represents an advance over the prior art because of its greatly enhanced speed. He testified to a production rate of 2,400 forms an hour achieved by shaping 100 sheets an hour, each sheet containing 24 forms. The sheets are each individually heated and placed under the multiple forming die one after the other. From this it is evident that the gradualness of the descent of the die and the substantial portion of the drawing operation involve at most untimed fractions of a minute.

The second Borkland patent is Patent Re. 23,171, dated November 29, 1949, for "Apparatus for and Method of Forming Sheet Material." The only relevant difference between the process claimed in the reissue patent and that covered by the first patent is that a fourth step is added, the use of differential air pressure to cause the sheet material to conform to the male die.

The reissue patent contemplates that step four may take place in varying relative sequences to the course of the descent of the die in step three of the process disclosed in the first patent but should be in part, if not in whole, concurrent with step three.

The reissue patent contains eight claims. In claims 1, 2, 4 and 5 the process includes the use of "suction" so as "to suck" the ductile sheet material against the male die.[6] Claim 3 is for an apparatus in which the male die is equipped with a "suction" device enabling the die to "suck" the ductile sheet material against the die.[7] Claims 6, 7 and 8 are for a method in which the sheet is forced against the male die by "exhausting the air" from the space between the sheet and the male die.[8] In setting forth the objects of his invention[9] and disclosing his apparatus[10] and methods[11], the

6. Claim 1 in material part reads: "A method of forming a ductile sheet of material into a form including protuberances interspaced with indentations which comprises anchoring said sheet * * *, effecting relative movement between said anchored sheet and a forming punch having corresponding protuberances and indentations thereagainst until at least part of the material is bridging a pair of protuberances to form a closed chamber between said protuberances and the face of the forming punch, and then applying suction to the chamber to suck said bridging portion of the material against the face of the forming punch" (col. 4, line 73, to col. 5, line 12).

7. Claim 3 in material part reads: "Apparatus for forming a ductile sheet of plastic material into a cupped formation comprising supporting means for holding the portion of the sheet adjacent the portion to be cupped against lateral slipping, a reciprocal forming punch movable transversely against a portion of the sheet to be cupped, means associated with said forming punch for applying suction to the cupped portion of the sheet during the forming punch applying and withdrawing movement while the sheet is still held by said holding means to suck the sheet against the forming punch surface during the forming movement" (col. 5, lines 32–45).

8. In claim 6 the fourth step is described as "exhausting the air" from the space between the re-entrant surface and the sheet to cause the sheet to be forced against the re-entrant surface" (col. 6, lines 36–39).

9. "One of the objects of the invention is the provision of improved apparatus * * comprising a single forming punch * * and suction means contributing to the forming operation" (col. 1, lines 10–16). "Another object * * * is to provide an improved method * * * by the use of a single forming punch combinedly operating with air suction" (col. 1, lines 17–22).

10. "At its upper end the forming punch 21 includes a chamber 24 of generally cylindrical shape communicating with a source of vacuum (not shown) through a flexible tube 25" (col. 2, lines 31–35). "Serving to connect chamber 24 with the re-entrant zones 23a and 23b is a plurality of passages, as shown, comprising two concentric groups of apertures 31 and 32 (Fig. 4), although if preferred the passages between chamber 24 and zones 23a and 23b may be annular and substantially continuous about the periphery, i. e., interrupted only by ribs to maintain the integral nature of the forming punch 21" (col. 2, lines 39–47).

11. "Following any desired ductilization * * * the forming punch 21 begins to

words "suction" and "vacuum" are used without reference to other methods of exhausting air. However, the file wrapper history of Borkland Patent No. 2,-442,338, which was surrendered and reissued as Re. 23,171, shows that the more inclusive concept of exhausting air was deliberately included in various of the claims so that the patent would cover the use of all forms of differential air pressure to force the material against the male die. It is there pointed out that the use of the word "exhausting" would connote not only the "use of suction but would be applicable to a construction in which the trapped air was enabled to escape and was exhausted by being forced out, for example, by fluid pressure applied to the outside surface of the sheet" (File Wrapper of Patent No. 2,442,338, page 95).

Both the plaintiff and the defendants agree that the first Borkland patent and the reissue patent have exactly the same scope except that the former omits and the latter adds the use of differential air pressure. They thus treat the first patent as applicable to as wide a range of materials to be used in processing and to production of as diverse types of articles as the reissue patent although in both of these respects the claims of the reissue patent appear to be more all inclusive.

Claim 1 of the reissue patent is phrased broadly in terms of using "a ductile sheet of material" (col. 4, lines 73–74) without further limitation. The specifications state that "Any suitable material may be used for the ductile sheet, such as cellulose acetate, ethyl cellulose, and various other plastics, or the like" (col. 4, lines 64–66). The range of the thickness of material which may be formed by the method and apparatus described

is placed at from 0.002 inch to .500 inch (col. 4, lines 55–58). Whereas the first patent assumed the use of a thermoplastic material which would require heating to render it ductile, various of the claims of the reissue patent omit all reference to heating and purport to cover any ductile sheet irrespective of the temperature at which ductility occurs.[12] The specifications in the reissue patent state that "Ductilizing temperature or other ductilizing treatment would depend upon the thickness of the material, its chemical nature and the shape of the article to be formed" (col. 4, lines 60–63).

With respect to the type of articles to be produced, the reissue patent begins with the statement, "This invention relates to the forming of hollow articles from sheets or strips of plastic material" (col. 1, lines 1–2). Claims 1 and 2 are for shaping "a form including protuberances interspaced with indentations" (col. 4, lines 74–75; col. 5, lines 17–18). Claim 3 refers to "forming a ductile sheet of plastic material into a cupped formation" (col. 5, lines 32–33). Claims 4, 5, and 6 use the phrases, "In the art of successively forming articles from thermoplastic sheet material * * *," 4 and 5 "of forming a ductile sheet into a form including protuberances interspaced with indentations" (col. 5, lines 50–56; col. 5, line 70 to col. 6, line 1; col. 6, lines 18–26). Patent 2,357,806 claims only for "A method of forming thin flat thermoplastic sheet into a cupped formation having a bottom portion and outwardly flaring side portions" (page 2, col. 2, lines 5–7).

The allegedly infringing processes used by the defendants were stipulated. There is no dispute but that the type of materials going into their products and the type of articles formed fall within

---

move downward against the material * * * and an air suction is applied * * *. Depending upon the particular shape of the article, the suction may be applied continuously during the entire downward movement * * *. Any such timing of the application of suction * * may be by means of an automatically or

manually controlled valve" (col. 3, lines 9–27).

12. Claims 1, 2, 3, 4 and 6 of Re. 23,171 make no reference to heating but refer merely to a "ductile" sheet. Claims 5, 7 and 8 parallel the claim in Patent No. 2,357,806 in that they list the heating step.

the claims of the Borkland patents. Nor is there any dispute that the processes generally used by defendants infringe. Only in those instances where defendants add a step to the process is there any serious contention by the defendants that they do not infringe. The stipulation shows that defendants uniformly use the four step process above described, namely, heating, fastening, forming with male die and using suction to assure the full conformity of the material to the male die.

For some of their products the defendants use a five step process which includes the above four steps plus an intermediate step inserted after the first two steps. Following the heating and fastening the defendants on occasion use suction to draw the sheet downward so that solely as a result of the suction the sheet temporarily assumes a generally concave form. This has the effect of placing the sheet in an already thinned and stretched state when the male die descends upon the sheet while it is still held by downward suction in such a concave form. The downward suction is released after the male die has begun to press on the sheet. Once the position of ultimate pressure has been assumed by the male die a counter upward suction is applied through the male die in substantially the same manner as step four of the reissue patent. The only difference is that the plaintiff's claims apparently prescribe the application of the upward suction during the descent of the male die and the termination of the suction by the time the point of ultimate pressure is reached, whereas the defendants use the upward suction only after the point of ultimate pressure is reached. While the defendants have called attention to this difference in comparing the claimed processes with the prior art, they make no contention that it has any other materiality in this case.

From the foregoing it is evident that the issue of the validity of the patents is squarely presented. If the patents are valid certainly some, if not all, of the defendants' processes infringe.

█   The patents are by statute made presumptively valid and the burden of establishing their invalidity rests upon the party asserting it. Section 1 of the Patent Act of 1952, 35 U.S.C. 282. This burden has here been assumed by the defendants. They introduced extensive evidence of prior public use of a process they regard as in all essential respects identical with that claimed by Borkland —a process used at Leominster, Massachusetts, by numerous companies from 1916 to 1940 to form articles from sheets of celluloid. The defendants likewise cited and introduced in evidence numerous patents beginning with an early United States patent issued in 1880 and German and British patents of 1889, 1890 and 1891, all for the formation of articles from sheets of celluloid, and continuing through numerous subsequent United States patents for the formation of a variety of plastic materials coming down to the date of Borkland's patents. A well qualified expert in the art of forming plastics, Henry M. Richardson, was called by the defendants to compare the processes shown in the cited patents with those claimed by the plaintiff. Under questioning by the court Mr. Richardson stated it to be his opinion that neither Borkland patent disclosed anything novel and that both had been fully anticipated. The plaintiff contented himself with taking the witness stand, performing his processes in court, introducing in evidence his patents and samples of his apparatus and products, and cross-examining the defendants' witnesses.

In considering the case the court has been seriously handicapped by the failure of the plaintiff to explain what in his claim was novel or constituted his invention. This is not evident from the face of either patent and the deficiency has not been supplied during the presentation of the case. After analyzing the evidence, as more fully set forth hereinafter, the court has been forced to conclude that each step in Borkland's processes, as well as his combination of the

steps, had long been well known in the art.

■ As a matter of law it is sufficient to invalidate the patents that they disclosed no new elements or functions. The plaintiff's patents are each combination patents. Hence the prior knowledge of each step would itself preclude a patent of the combination unless some new and unforeseen result was achieved by a new combination of old steps. Lincoln Engineering Co. v. Stewart-Warner Corp., 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; Standard Brands, Inc. v. National Grain Yeast Corp., 1939, 308 U.S. 34, 60 S.Ct. 27, 84 L.Ed. 17; Jungersen v. Ostby & Barton Co., 1949, 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235; Dorr Co. v. Yabucoa Sugar Co., 1 Cir., 1941, 119 F.2d 521, 526. Here again the plaintiff has not even indicated any respect in which the aggregation performs or produces any different function or operation than had long been well known to result from the use of these steps in various combinations.

At most the plaintiff asserts an enhanced efficiency in production but the defendant has adequately shown that this is not due to anything new or novel in the patents. Rather the court finds that the greater rate of production achieved by plaintiff is due solely to extraneous factors not constituting part of the patent grant.

With respect to plaintiff's own production processes the increased rate of production appears to be attributable almost, if not entirely, to the use of multiple dies. The plaintiff contends that his discovery that the sheet of plastic must be fastened securely at the edges to prevent slipping makes possible the use of multiple dies. It may be true that simple multiple dies such as plaintiff uses would not work if the forming process required some slipping of the material such as was apparently allowed in some of the Leominster processing of sheet celluloid. But as is set out hereinafter, Borkland did not discover the necessity of fastening the sheet tightly against slippage. This discovery was the novelty expressly disclosed and claimed in German Patent No. 50,008 of 1889, and was thoroughly understood and used where appropriate in the Leominster process as well as in processes set out in numerous patents over a long period of years.

■ Of course, an increase in efficiency not due to any new discovery is not the basis for a patent. Great A. & P. Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162; Grinnell Washing Mach. Co. v. E. E. Johnson Co., 1918, 247 U.S. 426, 434, 38 S.Ct. 547, 62 L.Ed. 1196; Diamond Iron Works v. Wisconsin Foundry & Mach. Co., D.C.Wis.1941, 36 F.Supp. 378, 381, affirmed, 7 Cir., 1941, 121 F.2d 363, 366; Nordell v. International Filter Co., 7 Cir., 1941, 119 F.2d 948, 951; Minnesota Mining & Mfg. Co. v. Industrial Tape Corp., 7 Cir., 1948, 168 F.2d 7, 11.

Step one of Borkland's process, namely, the heating of the plastic sheet to render it ductile prior to forming it, has been well known and used for years. In British Patent No. 246, of 1890, the first step in a process for forming hollow articles from sheets of celluloid or similar materials is heating the sheet either over a furnace or by dipping in boiling water (page 1, lines 10–11; page 2, line 26). Celluloid is cellulose nitrate, a thermoplastic material. The British patent stated that, "Instead of celluloid I may use fibrolithoid, xylonite, celluline, and generally all materials having a base of camphor and cellulose" (page 2, lines 19–20).

German Patent No. 68,752, of 1893, for "A Procedure for Stamping of Hollow Bodies from Celluloid" specifies the heating of the sheet of celluloid as a preliminary to its formation.

Heating a sheet of celluloid prior to applying a forming die was a step in the processes used by numerous companies engaged in manufacturing hollow articles from celluloid, at Leominster, Massachusetts, from 1916 to 1940. In accordance with the disclosures of the British patent, the Leominster processes

used either dry heat or dipping in boiling water. The latter was more common because of the high inflammability of celluloid.

Any form of heating the sheet to render it ductile is the equivalent of Borkland's first step. Indeed, in Borkland Patent Re. 23,171, various of the claims make no mention of the heating step but instead merely specify the use of a ductile sheet. Consistently, the specifications of Re. 23,171, state: "If the nature of the material is such that ductility must be imparted by heating or otherwise, such part of the process may be performed prior to or after the time the blank is brought into position" (col. 3, lines 1–5).

In Strauch Patent No. 2,210,509, of 1940, claim 7 covers a "method of forming a shaped cavity in a sheet of organic thermoplastic material" and claims the heating of the material as a step preliminary to molding (page 6, col. 2, lines 18–20).

In Kopitke Patent No. 2,282.423, of 1942, for "Process and Apparatus for Forming Articles from Organic Plastic Material," each of the claims discloses heating as a step preliminary to forming plastic sheets of material into hollow articles. The propriety of treating Kopitke as anticipatory of Borkland Patent No. 2,357,806, has been challenged by plaintiff on the ground that Borkland's invention in fact predated the application for the Kopitke patent. Under the Patent Act of 1952 (35 U.S.C. 102(e)) a person is not entitled to a patent if the same invention was patented on an application filed prior to his invention. The Kopitke patent issued May 12, 1942, on an application filed September 15, 1939. When the Patent Office cited the Kopitke patent against Borkland's application for Patent No. 2,357,806, Borkland filed an affidavit, with annexed drawings, in an effort to prove that he had reduced his invention to practice prior to September 15, 1939. Evidence adduced in this case establishes that the affidavit and drawings so filed with the Patent Office disclosed merely the experimental use by Borkland prior to September 15, 1939, of two fully matching dies, male and female, to form sheets of heavy felt or brass material. Borkland did not until a later date reduce to practice the process covered by his claims in either of his subsequent patents. The relevant application on Re. 23,171 was filed May 25, 1944, more than a year after the Kopitke patent had issued. A person is not entitled to a patent if the same invention was patented more than a year prior to the date of his application for a patent (35 U.S.C. 102 (b)). Therefore, the Kopitke Patent No. 2,282,423 in its disclosure of the heating step, anticipated both Borkland patents.

Step two of Borkland's processes, namely, the fastening of the plastic sheet securely to prevent it from slipping, was claimed as the novelty of the invention in German Patent No. 50,008, of 1889, for a process of manufacturing hollow celluloid spheres. The second sentence of the fourth paragraph of the patent, according to the stipulated translation, reads:

"The provision of plate c, which is pushed by any convenient means against the mould a for the purpose of keeping the inserted circular celluloid foil d uniformly fixed at its edges, is on the contrary novel and forms the subject matter of the present invention."

British Patent No. 246, of 1890, heretofore described in part in connection with the above discussion of the heating step, likewise discloses the fastening and holding of the plastic sheet at its edges prior to application of the forming dies. Although this British patent does not state as explicitly as the German patent that the plastic sheet must be kept uniformly fixed at its edges, it does disclose alternate devices "to prevent the formation of folds during the stamping operation" (page 1, line 20). As described in the specifications and shown in the drawings, these devices es-

tablish that an essential step in the process set forth in British Patent No. 246 was the holding of the sheet secure against slipping.[13]

The Leominster processing constituted a public use of the step of fastening a plastic sheet securely at the edges to prevent slipping. Various witnesses testified that at Leominster, for certain designs, the celluloid was clamped firmly so it could not slip.[14] In addition the surfaces of the clamps were on occasion especially roughened for the purpose of supplying a means of obtaining a firmer grip upon the celluloid. Clamps used in Leominster and having such roughened surfaces were introduced in evidence as exhibits.

The Strauch Patent No. 2,210,509, of 1940, points out that the sheet may either be held taut (page 1, col. 1, lines 18, 34) or may be permitted to follow the dies to some degree (page 2, col. 2, lines 30–35).

The Kopitke Patent No. 2,282,423, heretofore mentioned, discloses a method of turning down the edges of a strip or ribbon of plastic material to form flanges which are arranged to slide through parallel grooves. The dies form but one article at a time, the strip or ribbon being slid through the grooves after each article is completed so that the material for the next article assumes its appropriate position relative to the dies (page 2, col. 1, line 70 to col. 2, line 12). The patent states that the details of fasten-

ing the sheet are not part of the claimed invention, "as all that is required is that means be provided by which a sheet or strip of plastic material may be brought into forming position after being heated * * * and distortion of the sheet or strip prevented during the heating, the movement to the forming position and the forming" (page 2, col. 2, lines 14–21). This process discloses the firm securing of the plastic material by its two sides to prevent any slippage during the molding operation.

Step three is the application of unheated pressure-exerting means in such a manner that the pressure-exerting means do not touch the pressure-receiving portions of the sheet during a substantial part of the drawing and forming operation. The Leominster processes and all the patents above mentioned disclosed this step. Neither the German nor British patents prescribe that the forming dies are to be unheated but this is implicit in the process and apparatus disclosed. In the Leominster processes the testimony showed that the dies were unheated. Strauch Patent 2,210,509 makes a point of the unheated dies, stating that the plastic material "will set almost instantaneously on contact with the substance of the object [used as a male die], which has a temperature substantially lower than the softening point of a thermoplastic material" (page 3, col. 1, lines 30–34; page 1, col. 1, lines 21, 28). Kopitke Patent

13. One such device is described as a stamp "surrounded by a spring sleeve the lower end of which constitutes a pressing ring. This sleeve is guided by pins. During the whole time of the descent of the stamp, the pressing ring bears on the disc of celluloid until the stamping is finished" (page 1, lines 21–24). This device is almost, if not entirely, the same as the device disclosed by the German patent (compare British Patent No. 246, Fig. 3, with German Patent 50,008, Figs. 5 and 6). The alternate device is disclosed as follows: "In this case instead of clamping the edges of the celluloid disc *b* upon the bed die by means of spring pressure as described, the margin of the disc is clamped by a ring

*c* notched at *e* to give passage to lugs *d* by which the ring is held down. By partially rotating the ring whose upper surface is slightly inclined at *g*, the celluloid becomes firmly clamped upon the bed die" (British Patent No. 246, page 2, lines 34–39).

14. Witnesses so testifying included LeRoy W. Vinal, an experimental engineer employed with various companies at Leominster from 1920 to date; Cornelius E. Buckley, proprietor of a plastic manufacturing business at Leominster since 1939 and prior thereto factory manager of such a business; Louis H. Girouard, superintendent associated with plastic manufacture at Leominster since 1924.

No. 2,282,423 expressly specifies unheated dies, although he goes further and prescribes non-heat exhausting material, such as fibre, for the male die and a heat exhausting material, such as metal, for the female die (page 2, col. 1, lines 20–32).

The element of stretching and drawing portions of the material which do not touch the pressure-exerting means has been most fully disclosed and discussed in two patents for the formation of objects from sheet rubber. It is well known in the art that the stretching characteristics of a sheet of ductile rubber are the same as all other sheets of ductile plastic materials, the only difference in the processing arising from the different temperature changes necessary to achieve ductility or to freeze the newly acquired form. In one of these rubber patents, Steele Patent No. 1,535,354, of 1925, it was disclosed that the portions of the sheet in contact with a die do not stretch freely and uniformly, if at all, and hence as small a point as possible of the sheet should touch the die until the stretching and drawing had been completed: "each portion of the sheet as it contacts the former is precluded from thereafter stretching, and stretching is confined to the portion of the sheet between the former and the annular edge of the die" (page 1, lines 100–106). When a perfectly convex male die is applied to a ductile sheet held securely at its edges "there is a progressive action from the center to the edge until the article is completely shaped" (page 1, line 106, page 2, line 2).

Sampson Patent No. 2,007,548, of 1935, for a "Method and Means for Forming Hollow Articles out of Sheet Rubber or the Like," teaches that any plastic sheet material can be stretched evenly and uniformly by applying a mechanical pressure-exerting device in which the portions of the material being stretched do not touch the pressure-exerting means (page 1, col. 1, lines 10–54). His claim 1 reads:

"The method of forming hollow rubber articles from a sheet of uncured rubber, consisting in holding the sheet free of other contacts within delimited lines, applying pressure only to a comparatively small area of the sheet within said lines and thereby stretching the sheet in substantially uniform thickness in straight lines between the holding lines and the initial pressure area and then applying pressure generally to the stretched sheet" (page 2, col. 1, lines 51–60).

Sampson further teaches that the pressure-exerting means used both for the stretching and the forming may be a male die variously shaped so that its original contacts with the ductile sheet may either be at a single point or at multiple points.

The foregoing analysis of the process of stretching, drawing and forming as set forth by Steele and Sampson makes it plain that this same element of step three was present in the processes disclosed by the British and German patents and used at Leominster. Strauch and Kopitke likewise disclose this element in step three as applied to the formation of thermoplastic sheet material.

During the trial the plaintiff suggested that his contribution was the formation of sheet plastic by the use of a male die either alone or with only a partial female die. The specifications and drawings in Patent No. 2,357,806 disclose the use of a skeleton female die or sponge rubber to cause the material to conform to the male die while Re. 23,171 shows the use of differential air pressure with a male die. It is undisputed that in the Leominster processes there was a public use of a male die with either a hollow ring or a rubber sheet serving in lieu of the female die. Strauch Patent No. 2,210,509 in most of his claims achieves complete formation by using solely a male die. Weikert Patent No. 2,295,066, of 1942, forms a thin thermoplastic sheet by using a male die without a matching female die.

Step four, namely, the use of differential air pressure to cause the ductile sheet material to conform to the con-

tours of a male die, had been known in the art of forming rubber sheet material. The use of a vacuum to suck a sheet of rubber against a male die was disclosed as early as Smith Patent No. 516,028, of 1894, and appears as recently as Blair Patent No. 2,338,022, of 1943.

Some of the male dies used in the Leominster processes had air vents through which the air was exhausted from the space between the celluloid sheet and the male die. One such male die, which had been used in Leominster more than twenty-five years ago, was introduced in evidence as an exhibit. The air was exhausted as a result of the force exerted by the male die against the ductile plastic sheet or as a result of force exerted on the opposite side of the sheet by air pressure, becoming cupped below the sheet as the male die descends, rubber cushion into which the male die and sheet were plunged, or matching female die. The Borkland reissue patent, it is to be recalled, expressly claims in terms of exhausting the air between the sheet and the male die and does not limit itself to suction by use of vacuum. And as a matter of principle, any method of creating a higher air pressure on the side of the sheet opposite the male die will cause the air to be exhausted from between the sheet and the male die if a means of escape is provided. Exhaustion by suction has no different effect, so far as the process here involved, than exhaustion by any other form of pressure.

Strauch Patent No. 2,210,509, of 1940, claimed the use of differential air pressure to force a plastic sheet against a male die.[15] Kopitke Patent No. 2,282,-423 discloses just the opposite use of differential air pressure, namely, to force a plastic sheet against a female die, using either a vacuum to suck the sheet to the female die or air blown through the male die to force the material against the female die.

There is not the slightest doubt but what each step in the processes claimed in the plaintiff Borkland's patents had been anticipated by prior patents, as well as known in the art of forming plastic sheet material prior to the time Borkland applied for a patent on his claims. Since Borkland's combination of these steps disclosed nothing new or novel, his patents were invalid under the Patent Act of 1952 (35 U.S.C. §§ 102, 103) irrespective of whether his exact combinations of the steps had been anticipated. There had been previous combinations of these steps or their equivalents which serve to make it even plainer that Borkland's patents disclose no patentable invention.

Identically the same three step combination claimed in Borkland's first patent was disclosed by British Patent No. 246, of 1890, and German Patent No. 50,008, of 1889, and was publicly used in Leominster, Massachusetts, from 1916 to 1940. The only omission apparent is the failure of the German patent to mention any means of rendering the celluloid ductile. It is obvious from the processes set forth in the German patent that even at that early date, no one who was familiar with the characteristics of celluloid, would have tried to form the celluloid without first ductilizing it. The plaintiff concedes as much but suggests the ductilizing may have occurred through the use of heated dies rather than the direct heating of the sheet. The apparatus disclosed in the German patent effectively negatives any suggestion that the apparatus or some part thereof was heated instead of the sheet. The court reads the British patent and the German patent as identical and as prescribing the same heating, fastening

15. Claim 8 of the Strauch Patent No. 2,-210,509, of 1940, lists as one step in forming "a shaped cavity in a sheet of organic thermoplastic material" by using both a shaped male die and an unshaped female die the application of differential gaseous pressure "by supplying positive super-atmospheric pneumatic pressure between the female die and the sheet being formed prior to the rigidification of the heated portion of the sheet" (page 6, col. 2, lines 42–45).

and forming steps as Borkland's Patent No. 2,357,806.

The four step combination claimed in Borkland's reissue patent was anticipated by the four step combination appearing in Strauch Patent No. 2,210,509, of 1940, the Leominster processes, and Kopitke Patent No. 2,282,423, of 1942. Claims 6, 7 and 8 of Borkland's Patent No. 23,171 appear in all material respects to utilize the same four step process as appear in claims 7 and 8 of the Strauch patent. The combination of the four steps of ductilizing the sheet, fastening it, molding with a male die and exhausting the air from between the sheet and the male die appears in Strauch claims 7 and 8.[16] Strauch, like the plaintiff Borkland, is "forming a shaped cavity in a sheet of organic thermoplastic material" (Strauch Patent No. 2,210,509, page 6, col. 2, lines 16–17).

In instances in the Leominster process where the male die had air vent holes for exhausting the air from between the ductile sheet and the male die, the same combination of the four steps for forming hollow articles of thermoplastic sheet material was being used.

While Kopitke Patent No. 2,282,423, of 1942, differs in detail from Borkland's four step process in that the male die is only used for the initial forming, a female die is used for the final forming, and the air is exhausted from between the sheet and the female die to cause conformity to the contours of the female die, in all its essentials the same four step combination is present. Using differential air pressure to force the sheet material against a female die does not differ in any material respect from Borkland's step four, as already explained. It can therefore fairly be said that Kopitke discloses the combination of the four steps of heating, fastening, pressing with a male die and final shaping by exhausting the air from between the sheet and a die. As in Strauch and in the Leominster processes, this four step combination is used by Kopitke to form hollow articles from thermoplastic sheet material.

The invention which this court refuses to credit to the plaintiff is not one which he credited to himself when he started out to get his patent. The file wrapper history of the plaintiff Borkland's Patent No. 2,357,806 shows that in his first application Borkland made no claim that he had invented any new process for shaping thermoplastic sheet material. His first application, dated October 2, 1941, was for a patent on "Lighting Shields." The specifications in this application disclosed the invention as a troughlike shield made of thin thermoplastic material for use with electric or fluorescent light bulbs. Some fifteen diverse objectives of the invention were set forth such as protecting against falling glass during bombing and permitting changes of color of light by means of a color on the surface of the shield or in the pigment to reduce

16. Strauch claim 7 so far as material reads: "The method * * * comprising the steps of heating * * * while preventing undesired deformation of the heated portion of the sheet by holding certain at least of the unheated portions of the sheet around the heated portion against relative movement, shaping the heated portion of the sheet by the application of mechanical pressure * * *, subjecting the opposite faces of the sheet to differential gaseous pressure prior to the rigidification of the material of the heated portion of the sheet being shaped to assist the mechanical pressure in forming the sheet to a desired shape" (page 6, col. 2, lines 16–31). While claim 7 of the Strauch patent provides for the application of mechanical pressure to both sides of the sheet, claims 1, 2, 4, 5 and 6 provide for use only of a male die. Claim 8 shows initial as well as final shaping by the male die as follows: "The method according to claim 7, wherein the mechanical pressure is supplied by a male die element engaging one face of the sheet * * * wherein the differential gaseous pressure is applied by supplying positive superatmospheric pneumatic pressure between the female die and the sheet being formed prior to the rigidification of the heated portion of the sheet" (page 6, col. 2, lines 36–46).

visibility to the enemy from aircraft in time of war. The claims were in form for an article but in substance for a method of making the article. The patent examiner promptly rejected all claims because "an article may not be defined by the method of making it" and also as not disclosing any invention over previous cited patents. Thereafter, as the result of a series of amendments, the application was changed to one for a patent for the three step process for "Making Cupped Formations of Thermoplastic Sheet Material," heretofore discussed. Thus, as the result of the interchanges between the Patent Office and the plaintiff, the plaintiff came to conceive of his invention as something very different from the one he originally started out to patent.

The file wrapper history further indicates that the Patent Office granted the patent without considering the impact upon plaintiff's claims of the early German and British patents for forming hollow articles of sheet celluloid and without any apparent knowledge of the Leominster processes. It seems likely that the failure of the Patent Office to find any broad general American patent covering these processes may be due to the circumstance that following the disclosures of the British and German patents all subsequent attempts to patent these processes, if any such attempts were made, were rejected as anticipated. Or it may be no such attempts were made as the extensive Leominster use from 1916 to 1940, following the expiration of the British and German patents, established in the art that these processes were now well beyond the stage in which any one could claim them as his own monopoly.

While Strauch and Kopitke were each patents predating Borkland by only a few years, they each claim, as the essence of the invention disclosed, very specialized applications of the basic processes shown by the British and German patents and the Leominster use

Strauch was primarily concerned with the discovery that articles might be packaged or covered with thermoplastic sheet material by these processes and by way of claiming all that was possible included one broad claim for "forming a shaped cavity in a sheet of organic thermoplastic material" by these processes. Kopitke was primarily concerned with the discovery of the alternate use of a male plunger to preform and then blow air against the partially shaped sheet to force it into the contours of the female die, in the course of which Kopitke disclosed in its essence the four step process which Borkland later claimed.

The record in this case makes it clear that Borkland by his work on the processes set forth in the two patents here involved has not made any contribution to the art of forming articles from plastic sheet material. Borkland Patent No. 2,357,806 and Re. 23,171 are invalid and void because they disclose no invention not theretofore known and patented.

The determination that the patents are invalid makes it unnecessary to consider whether the defendants' addition of one more step would remove their five step process from the category of the infringing.

On the original complaint, judgment will be entered for the defendants on the merits. On the counterclaim, a declaratory judgment will be entered for the defendants adjudging that Borkland Patent No. 2,357,806 and Re. 23,171 are invalid under the Patent Act of 1952 (35 U.S.C. 102 and 103) because they were each anticipated by earlier patents and public use and disclose no novelty over the prior art. The defendants will also have judgment for costs.

Counsel for the defendants are directed to submit judgment order within ten days from the date hereof. The foregoing memorandum contains the findings of fact and conclusions of law required under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.