GENERAL PLASTICS CORPORATION *v.* BORKLAND.

[No. 18,745. Filed October 22, 1957. Rehearing denied December 2, 1957. Transfer denied December 2, 1958.]

*Lockwood, Galt, Woodard & Smith, Fansler, Fauvre, Dongus & Chambers,* both of Indianapolis, and *McClure, Shenk, Whitehead & Bretz,* of Kokomo, for appellant.

*Haight, Goldstein & Haight,* of Chicago, Illinois, *John E. Fell, Fell & Ellis,* of Kokomo, *Batton, Harker & Rauch,* of Marion, *Harry T. Ice* and *Ross, McCord, Ice & Miller,* of Indianapolis, for appellee.

KELLEY, J.—Action by appellee for royalties allegedly due him from appellant under a license agreement. The issues raised by appellant's answers to appellee's complaint were submitted to the trial court, without jury, and the latter, at the conclusion of all the evidence, found for appellee and entered judgment that he recover of appellant the sum of $13,914.60, together with his costs. Appellant's motion for a new trial was overruled and this appeal followed.

The complaint, *inter alia,* alleged, in substance, that appellee was the inventor of "certain new and useful improvements in plastic products and in the art of manufacturing the same" and that on June 30, 1944 he had on file certain designated applications for letters patent of the United States; that at said time and continuously since appellee was engaged in inventing new and useful improvements in sheet plastic products and in the art of manufacturing the same, that on said date appellee entered into a certain written agreement (the same being the contract sued upon) with General Plastics Corporation, an Illinois corporation, which

said contract, as contemplated by the terms thereof, was assigned to and became obligatory upon the appellant, an Indiana corporation; that by said agreement appellee was to be paid certain royalties for the use of said "new and useful improvements invented by him (appellee) in plastic products and in the art of manufacturing such products"; that thereupon and thereafter and from and after July 1, 1945, appellant continuously used "the processes and methods in the manufacture of sheet plastic products embodied in the said improvements covered by the said letters patent and application for letters patent of the United States enumerated in said agreement"; that subsequent to the execution of said agreement and until about July 1, 1948, appellant from time to time made returns to appellee of its manufacturing operations under said license agreement and pretended to account therein for all products so manufactured and sold by it but since about July 1, 1948 appellant wholly failed to make such accounting or pay further royalties on account thereof and latterly has refused permission to appellee to inspect its books and records for determination of what royalties may now be due appellee; and that appellant is indebted to appellee under the terms of said contract in an amount not less than $35,000.00. (NOTE: Portions of the complaint are omitted as they have no bearing on the question presented.)

The pertinent parts of the written agreement sued upon, as filed with the complaint, are as follows:

"Memorandum of Agreement made and entered into this 30th day of June, 1944, by and between G. Walter Borkland . . . party of the first part, and General Plastics Corporation, a corporation organized and existing under and by virtue of the laws of the State of Illinois . . . party of the second part,

WITNESSETH:

Whereas, Borkland has invented new and useful improvements in plastic products and in the art of manufacturing such products, for which United States Design Patents Nos. D-130,570 and D-134,-481 have been issued and for which applications for Letters Patent of the United States, Serial Nos. *413314*, 498381, *537353* and 539653 have been filed; and

Whereas, the Corporation is desirous of employing the said improvements, and such other improvements as hereafter may be developed by Borkland, in the manufacture of plastic products:

Now, therefore, the parties hereto have agreed . . . as follows:

1. Borkland hereby licenses and empowers the Corporation to manufacture plastic products subject to the conditions hereinafter named . . . and to embody in such manufacturing the said improvements contained in said applications for Letters Patent and such other improvements as he may develop hereafter, and to sell products so manufactured, . . .

2. The Corporation agrees to make full and complete returns and to pay the license fees as hereinafter provided to Borkland . . . on all products manufactured and sold by the Corporation in the manufacture of which the said improvements or any one or more of them were embodied or employed. . . .

3. The Corporation agrees to pay Borkland license fees as follows:

(a) . . . a sum equal to . . . per cent of the gross receipts of the Corporation from the sale of products manufactured and sold by the Corporation *in the manufacture of which said improvements or any one or more of them were embodied or employed;*

(b) . . .

4. . . .

5. . . .

6. . . .

7. . . .

8. It is understood that the Corporation contemplates reorganizing as a corporation under the laws of the State of Indiana under the name and style of General Plastics Corporation of Indiana and the conveyance of its assets and the assignment of this agreement to the corporation so reorganized. The Corporation agrees, upon the completion of such reorganization, to cause such reorganized corporation, by proper corporate action, to ratify and adopt this agreement and to agree to be bound by all terms and conditions hereof to the extent and with the same force and effect as though the reorganized corporation had been the party executing and delivering the agreement in the place of the Corporation. . . .

9. . . .

In Witness Whereof, etc." (Our emphasis.)

As stated by appellee in his brief, only two of the numbered applications for Letters Patent set out in the contract are pertinent to the present controversy. The italicized application No. 413,314 was duly allowed and was issued on Sept. 12, 1944 as Patent No. 2,357,-806. This patent is referred to in the briefs as Patent No. 1. The italicized application No. 537,353 issued on June 1, 1948 as Patent No. 2,442,338. On October 4, 1949 appellee applied for a reissue of this latter mentioned patent and the same was reissued on November 29, 1949, as Re. 23,171. This patent is referred to in the briefs as Patent No. 2. The record discloses no contention that appellant used or employed any process or improvement by appellee other than the alleged patented methods and process afforded by said Patents No. 1 and No. 2. It follows, then, that appellee is entitled to recover on his alleged contract only if the methods and process contained in said Patents No. 1 and No. 2 are "new and useful improvements in plastic products and in the art of manufacturing the same." The contract is very specific that the license

fees or royalties were determined by and payable on the gross receipts from the sale by appellant of products in the manufacture of which appellant embodied or employed one or more of the "said improvements," (referring to the "new and useful improvements" contained "in said application for Letters Patent.")

Appellant urges, in the main, that in the manufacture of its products it followed the teachings of the prior art and the methods conferred by expired patents which were in the public domain and freely available to the public use; and that appellee failed to establish that the methods of production followed by appellant were the teachings of either said Patent No. 1 or said Patent No. 2.

Appellee contends that appellant's defense of reliance upon the process of expired patents was not raised before the judgment in the trial court and that, therefore, appellant is now precluded from raising that defense. It is difficult for us to perceive, and appellee furnishes us with no reference, that the following of the teachings of expired patents is not the following of the teachings of the prior art. We have been furnished with no authority holding that the teachings of the prior art are confined to the teachings of unexpired patents. The record discloses that appellant's Exhibits 19-A to 19-J (incl.) and 20-A to 20-F (incl.), the same being previously issued patents to various inventors, were offered and received in evidence. Nine of those patents had expired and seven were unexpired. They were offered and received in support of appellant's answers that it was following the teachings of the prior art and that appellee's patents, Nos. 1 and 2, were so restricted and limited in scope by the prior art as not to extend to or cover any method of process employed by appellant or its prede-

cessor. Upon the record, therefore, we find no merit in appellee's said contention.

In effect, it is appellee's position, in support of the judgment appealed from, that while appellant has the right to use the prior art without the payment of royalty to appellee, yet "there must be some showing that appellant intentionally proceeded in accordance with the teaching of such prior art." Although this contention, at first blush, may seem somewhat obscure and confusing, it resolves itself into an assertion that at the time the contract was entered into in June, 1944, the prior art was available but "never was known to any of the responsible officers of appellant," and that the methods employed by appellant in the manufacture of its plastic articles were those it "learned from appellee and not from any prior art expired patents," and, therefore, appellant cannot now successfully rely upon the defense of pursuance of the prior art. In its ultimate, such proposal evokes the consideration that appellant, at the time of the making of the contract, was then bound at its peril to know all the teachings of prior patents pertaining to the art of producing plastic articles and, failing such knowledge, it must continue the payment of royalties even if it be later found that the patents referred to in the agreement offered no invention not anticipated by the prior art.

The mere statement of the proposition suggests doubt as to its plausibility. But it would seem in this case that the indulgence of deep abstractions in the channels of pure rationalistic logic is obviated by the simple observation that the contract sued upon provides for the payment of royalties upon the productive utilization by appellant of "new and useful improvements" in the art of manufacturing plastic products which were the invention

of appellee. Now, if appellee agreed to furnish to appellant and permitted it to use his "new and useful improvements" in the making of plastic products, and it later appeared that the licensed methods or processes were, in fact, not "new and useful improvements" over the art available to all others, then it would seem logical and just that appellant should not be legally bound to further continue the payment of royalty for the non-deliverance of the very thing it contracted to receive in the form of authorized use. The respective parties have submitted and profoundly argued many cases involving infringements, contract relations of assignors and assignees and licensors and licensees of patents and patent rights, and kindred matters, but upon the record now before us, the question appears to be one not unusual in the consideration of contract cases.

The real and substantial query posed by the appeal is whether appellee supplied appellant with "new and useful improvements" in the art of making plastic products and authorized or licensed appellant to use the same for such purpose and for which appellant refused to pay, as it contracted to do. Appellee instituted the action on the contract, alleging that he was the inventor of and had licensed appellant to use such new and useful improvements in such art. The burden of proving such allegation dwelt with appellee. Appellant defended the action upon the ground, among others, that in making its plastic articles it used and employed the methods and procedures exemplified by the prior art (previously issued patents), all of which so limited and restricted appellee's patent claims that the latter did not extend to nor cover any method, process, apparatus, or practice employed by appellant. The burden of this allegation rested with the latter.

The briefs have many times suggested, and it may be freely conceded, that appellant cannot, in this action, attack the validity of appellee's patents nor can it accomplish such purpose by calling upon the arts, methods, and procedures incorporated or found in prior patents or applications therefor. But we think that in this action it may be equally conceded, that reference may be made to the prior art to determine whether appellee has furnished appellant with what it agreed to pay for, namely: new and useful improvements in the art of producing plastic products. If reference to such prior art be denied, then by what method shall it be determined whether the licensed improvements were new and useful? Such denial, in this case, would operate to restrain equal justice,—a thing not to be tolerated. In *Westinghouse Electric & Manufacturing Company* v. *Formica Insulation Company* (1924), 266 U. S. 342, 69 L. Ed. 316, 45 Sup. Ct. Rep. 117, an assignor-assignee case, the court announced the principle, seemingly applicable as well to licensor-licensee cases, in these words: "Of course, the state of the art cannot be used to destroy the patent and defeat the grant, because the assignor is estopped to do this. But the state of the art may be used to construe and narrow the claims of the patent, conceding their validity." And in *Motor Wheel Corporation* v. *Rubsam Corporation* (1937), 92 Fed. 2d 129, 131, C. C. A. 6th Cir., it is said: "In a royalty case the contract is limited by the scope of the patents, and the court must construe them."

The record reveals that appellee, then engaged in developing the formation of plastic sheets into formed products, together with other individuals organized and incorporated the General Plastics Corporation of Illinois. In June, 1941 one A. J. Calpha, Henry Erle-

wine, his son Richard, and his brother, Oscar, all apparently Indiana residents with business interests and some experience in manufacturing but with practically no knowledge of the novelty of making articles of thermo plastic material, purchased all the stock of said corporation. Appellee was retained in the service of the corporation and, by reason of his exclusive knowledge of and familiarity with the production work, was, in a sense, the directing influence. Shortly after the new owners acquired the stock of the corporation, appellee became president and general manager thereof, acquired stock and became a Director.

In August of 1941 an agreement was entered into by appellee and the corporation authorizing and licensing the latter to employ the method afterward incorporated in the later developed patent No. 1. This agreement terminated June 30, 1944 and on that date the written contract herein sued upon was entered into. Some time prior to January 1, 1945 the appellant corporation was formed and succeeded to the rights and interests of the Illinois corporation, including the involved contract. Appellee continued with the new corporation (the appellant) although no longer president, general manager, or director. In July of 1945 appellee left the employment of appellant. The latter continued payment of royalties under the involved contract until about July 1, 1948.

The evidence is sufficient to warrant the court to conclude that appellant employed and utilized the method or process provided by the original Patent No. 1 in its manufacture of plastic articles, although appellant earnestly insists that it continued the payment of royalties because said patent illustrated a lighting shield which the appellant had been making, and that when it learned that the patent was directed

to a method not used by appellant, rather than a lighting shield, payment of royalties thereunder was discontinued. As we have already indicated, the finding of the court on this point must be upheld unless it appears from the record that the methods or processes claimed by said Patent No. 1 were not "new and useful improvements in plastic products and in the art of manufacturing the same."

Said Patent No. 1 (Patent No. 2,357,806) was entitled as being a "Method of Making Cupped Formations of Thermo Plastic Sheet Material." The method, as shown by the claim, consisted of heating a sheet of thin, flat thermoplastic material, securing the marginal portion of the sheet to prevent lateral slipping, and then depressing the center portion of the sheet with an unheated pressure-exerting means to form the bottom of the cupped formation and by continuing the same pressure to stretch and draw the heated sheet to form the outwardly-flaring side portions of the cupped-formation, the pressure-receiving portions of the sheet being out of contact with the pressure-exerting means during at least a substantial part of the drawing and stretching operation.

Said Patent No. 2 (Patent Re. 23,171) is a reissue of an original Patent No. 2,442,338. It is entitled "Apparatus for and Method of Forming Sheet Material." The original Patent No. 2,442,338 was issued June 1, 1948 and contained six (6) claims. Of these, claims 1, 4 and 6 were surrendered and the reissued patent (Re. 23,171), comprising eight (8) claims, was issued on November 29, 1949. At the trial, appellee relied only on claims 4 to 8, inclusive. These claims, being too lengthy and repetitious to be here set out, may be generalized by saying that they incorporated the mechanical process above described with reference

to Patent No. 1 (Patent No. 2,357,806) with the additional employment of a vacuum and air suction method. This Patent No. 2 does not provide in all claims for the heating of the sheet material as is provided in said Patent No. 1. The involved principle in Patent No. 2 seems to be the drawing of the sheet against the surface of the forming punch (male die) by applying "suction" between the working surface of the forming punch and the sheet or by "exhausting the air from the space between the re-entrant surface and the sheet." Differently stated, instead of exerting the male die against the heated sheet of formable material, with outwardly-flaring sides to protect the forming material for a substantial part of the stretching operation, as provided by the Patent No. 1 method, the Re. Patent No. 2 utilized the device of vacuum sucking of the sheet against the die or exhausting the air between the die and the sheet, thereby causing the latter to be forced against the former.

The determinative question, therefore, seems to be whether the aforesaid method and processes afforded by said Patent No. 1 and Re. Patent No. 2 constituted "new and useful improvements in plastic products and in the art of manufacturing the same." To be such "new and useful improvements" requires that they were not anticipated by the prior art and that they were of such inventive novelty that they contributed to art of forming sheet material.

The Bill of Exceptions of the evidence given in this cause occupies two volumes, comprising some 436 pages of testimony, stipulations, and voluminous exhibits, including file wrappers, and patents with thousands of lines of small, single-spaced print of descriptions and claims as well as the numbered drawings attached to each. It would be a cumbersome, technical and utterly

useless task to undertake a detailed explanation of all the given patents, and a comparison of the descriptions and claims thereof with reference to the descriptions and claims of appellee's said Patents Nos. 1 and 2.

The Strauch Patent 2,229,613 of Jan. 21, 1941 entitled: "Process of and Apparatus for Forming Articles from Plastic Sheet Material" embodies practically every claim of appellee's Patent No. 1, including the outwardly-flaring sides of the male die (see Fig. 24 on page 57 of the Patent Volume of Appellant's Brief). The C. W. Steele Patent 1,514,183 of November 4, 1924 entitled: "Machine for Making Hollow Rubber Articles" and the Kopitke Patent 2,282,423 of May 12, 1942 entitled: "Process and Apparatus for Forming Articles from Organic Plastic Material" likewise embodied the claims of appellee's Patent No. 1, although the Kopitke patent possessed the added feature of "Supplying fluid pressure through said inner die to expand the plastic material between it and the outer die into conformity with the cavity of the latter."

The Sampson Patent 2,007,548 of July 9, 1935 entitled: "Method and Means for Forming Hollow Articles Out of Sheet Rubber or the Like" almost identically embodies the claims of appellee's Patent No. 2, even to the point of providing for multiple points of contact with the sheet as well as a single point of contact. The latter feature attains importance only because of appellee's claim in his said Patent No. 2 of "the art of successively forming articles from thermoplastic sheet material . . . ." The said Sampson patent utilized a vacuum suction method described as "means for withdrawing air from the chamber below the sheets," and related as "the formation of hollow articles from rubber or the like, by what is known as the

vacuum process . . . ." The patent was not confined to rubber but, as stated by the author, "I include compositions containing rubber, or rubber substitutes having qualities of plasticity, elasticity and/or curability similar to rubber." Reference is made also to the Stratford Patent 1,430,699 of October 3, 1922 entitled: "Method of and Apparatus for Making Hollow Rubber Articles" and the Busch Patent 1,737,874 of December 3, 1929 entitled: "Method of Forming Celluloid Articles." Both of these patents employed the vacuum process. Both patents, in differently stated fashion, disclosed, in principle, the vacuum method claimed by appellee in his Patent No. 2, but did not embrace the claim of "successively forming" the articles, as did appellee in his said Patent No. 2.

Much more could be said to demonstrate that the evidence, and particularly the documentary evidence of the referred to patents, clearly establishes that appellee's claims made in his said Patents Nos. 1 and 2, respectively, were anticipated and known to the art prior to his applications and patents and that his said claims were not "new and useful improvements" in the art of producing plastic products, but it would serve no good purpose to further encumber this opinion therewith.

As indicating the validity of our conclusion, it appears that the attendant principal question has been determined in the Federal Courts adversely to appellee. In the case of *Gustave W. Borkland* v. *Svend Pedersen and Borghild Pedersen, etc., d/b/a Paramount Plastics Co.* (1956), 142 F. Supp. 652, The United States District Court for the Northern District of Illinois, in a case involving the validity of the two patents here involved, viz.: Patent No. 2,357,806 and Patent Re. 23,171, the court minutely and exhaustively considered

the claims of the herein appellee in his said patents both with relation to the validity thereof and whether the processes enveloped by the two patents made any contribution to the art of forming articles from plastic sheet material. The court concluded thereon in these words:

> "The record in this case makes it clear that Borkland by his work on the processes set forth in the two patents here involved *has not made any contribution to the art of forming articles from plastic sheet material.* Borkland Patent No. 2,357,806 and Re. 23,171 are invalid and void *because they disclose no invention not theretofore known and patented.*" (Our emphasis.)

The judgment of the said District Court in said cause was affirmed by the United States Circuit Court of Appeals for the Seventh Circuit, (See 244 F. 2d 501) (CA-7-1957), which, in its opinion, said:

> "We conclude that the court was entirely justified in finding that the prior use was sufficiently proved."

In our opinion, appellee has failed to establish that the improvements he contracted to license to appellant in consideration of the designated royalties were "new and useful" improvements in plastic products and in the art of manufacturing the same. It follows that he was not entitled to recover against appellant upon the contract sued upon.

The judgment appealed from is reversed and cause remanded with instructions to the trial court to sustain appellant's motion for a new trial.

NOTE.—Reported in 145 N. E. 2d 393.